The STATE of Ohio, Appellee,

v.

GONZALEZ, Appellant.

[Cite as *State v. Gonzalez*, 154 Ohio App.3d 9, 2003-Ohio-4421.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020384.

Decided Aug. 22, 2003.

10

12

14

Michael K. Allen, Hamilton County Prosecuting Attorney, and James Michael Keeling, Assistant Prosecuting Attorney, for appellee.

Lane, Felix & Raisbeck Co., L.P.A., and Thomas E. Raisbeck, for appellant.

MARK P. PAINTER, Judge.

{¶ 1} We affirm defendant-appellant Nader Gonzalez's conviction on two counts of felonious assault for his failure to disclose to a sexual partner his knowledge that he was HIV-positive.[1] This new manner of committing felonious assault was added in 2000. Gonzalez's crimes are second-degree felonies, and the trial court sentenced him to the maximum term of 16 years in prison.

{¶ 2} Gonzalez contends that the statute under which he was convicted is unconstitutional, and that the trial court committed myriad errors. We hold the statute constitutional and hold that the trial court's errors were harmless.

## I. Decision Summary

{¶ 3} (1) R.C. 2903.11(B)(1) is not unconstitutionally vague. The word "disclose" is easily understood.

{¶ 4} (2) R.C. 2903.11(B)(1) does not inflict cruel and unusual punishment.

{¶ 5} (3) R.C. 2903.11(B)(1) does not violate due process by failing to provide for an affirmative defense. On the contrary, it places the burden on the prosecution to prove the *lack* of an affirmative defense—a disclosure—beyond a reasonable doubt.

---

1. R.C. 2903.11(B)(1).

{¶ 6} (4) By complying with R.C. 3701.243(B), which requires a search warrant or subpoena, law enforcement authorities may obtain HIV medical records for investigative use but may not further disclose those records.

{¶ 7} (5) Law enforcement authorities—or anyone else—cannot disclose HIV medical records without complying with R.C. 3701.243(C), which requires a common pleas court to find "compelling need" for disclosure.

{¶ 8} (6) In this case, the state did not comply with R.C. 3701.243(C), and the medical records should not have been admitted, but their admission was harmless error, as there was much other evidence that Gonzalez was HIV-positive and that he knew it.

{¶ 9} (7) R.C. 3701.243(C), when properly complied with, allows the admission of HIV medical records, trumping the medical-privilege statute, R.C. 2317.02(B).

{¶ 10} (8) In a prosecution for felonious assault under R.C. 2903.11(B)(1)—engaging in sexual conduct with another person without disclosing HIV-positive status—evidence that the victim is HIV-positive after such conduct is irrelevant and inflammatory. Only if the defendant's HIV status is a legitimate issue and the victim testifies that the victim was HIV-negative before the conduct, HIV-positive after, and had no other sexual partners, would the evidence be admissible. Otherwise, such evidence is both irrelevant and inflammatory. But in this case, we hold that the error was harmless.

{¶ 11} (9) The jury verdicts were not inconsistent. While the trial court should have made clear to the jury that HIV status once disclosed was sufficiently disclosed, the jury did not lose its way.

{¶ 12} (10) The evidence was sufficient to convict Gonzalez beyond a reasonable doubt; and the manifest weight of the evidence was consistent with guilt.

{¶ 13} (11) Gonzalez was properly classified a sexually oriented offender.

{¶ 14} (12) Consecutive and maximum sentences, while harsh, complied with the sentencing guidelines and were not clearly and convincingly unsupported by the record. But we caution that consecutive sentences are disfavored and will not be approved if they are disproportionate to the crimes involved.

## II. Gonzalez has AIDS

{¶ 15} In June 1999, Gonzalez became very sick and checked into University Hospital in Cincinnati. Gonzalez's doctor, Dr. Sandra Riegler, testified that Gonzalez tested positive for HIV and that she made a clinical diagnosis that Gonzalez had AIDS. Dr. Riegler testified that Gonzalez was experiencing several life-threatening illnesses caused by his weakened immune system. After ten days in the hospital, Gonzalez recovered enough from his secondary illnesses to be released.

{¶ 16} On the day he was discharged from the hospital, Gonzalez went to see Dr. Lisa Haglund at the Infectious Diseases Center, located in the Holmes Hospital in Cincinnati. Dr. Haglund testified that she was primarily responsible for writing prescriptions for the numerous medicines that Gonzalez needed to keep the virus under control, and for setting up appointments for blood tests to continuously monitor his condition. Dr. Haglund testified that she wrote in her notes that she was concerned that Gonzalez was depressed and that he was in denial about his illness. She also noted that Gonzalez was at times noncompliant with either his medicine or his treatment plan.

### III. Gonzalez and Alvarado Meet

{¶ 17} In March or April 2001, Gonzalez met Maria Jose Alvarado while dancing at a Latin nightclub. They talked and danced, and exchanged phone numbers at the end of the evening. They began dating, meeting at various dance clubs over the next several weeks. About 15 days after they met, they began a sexual relationship, either in late April or early May. They continued this relationship until June or July 2001. (The uncertainty about the months may explain the later jury verdicts.)

{¶ 18} The stories of Gonzalez and Alvarado differed as to whether Gonzalez disclosed his HIV-positive status to Alvarado before the sexual relationship began. Alvarado testified that Gonzalez never told her that he had HIV, and that she had no suspicion that he was HIV-positive, before they had sex. She testified that they used a condom the first time, but never again. According to Alvarado, after the first time, Gonzalez asked her to take birth-control pills, and she agreed to do so.

{¶ 19} Alvarado testified that sometime in April she met Carlos, Gonzalez's friend, who told her that Gonzalez had AIDS. Alvarado confronted Gonzalez, who assured her that it was a lie, and that he did not have anything. Alvarado believed Gonzalez and continued the relationship. In June, another friend of Gonzalez, Elizabeth Shrader, told Alvarado that Gonzalez was sick. Alvarado testified that, at this point, she stopped talking to Gonzalez and got tested for sexually transmitted diseases. Several weeks later, when she received the results of her test, Alvarado learned that she was HIV-positive. Alvarado testified that she went to Gonzalez's house and told him the results of her test, but that he still denied that he had anything or that he had infected her.

{¶ 20} In contrast, Gonzalez testified that, the night before he and Alvarado first began their sexual relationship, Alvarado told Gonzalez that she had heard that he was HIV-positive. Gonzalez testified that he agreed that it was true, and that he had not told her that he was HIV-positive because they were just friends. Gonzalez testified that the next night Alvarado said that she had heard that

people with HIV could have normal relationships with others, as long as they used protection. Gonzalez agreed that was what his doctor had told him, but that it was up to her. They later went to her house and had consensual sex.

{¶ 21} Gonzalez testified that he and Alvarado used a condom not only the first time, but every time after that. Gonzalez denied that he and Alvarado ever had a conversation concerning her using birth-control pills. Gonzalez said that he always used a condom out of fear of either giving or receiving an infection. He also testified that he had never and would never expose someone to his illness without telling the person of the risk.

### IV. Defense Witnesses

{¶ 22} To bolster his claim that he would not have had sex with a person without first disclosing his HIV status, Gonzalez offered the testimony of his previous girlfriend, Giuliana Gelke, whom he dated after learning he was HIV-positive, but before meeting Alvarado. Gelke testified that she met Gonzalez in late November 1999. She testified that they spent time together for several weeks, as friends. Sometime in December, Gonzalez told her that he had been very ill and in the hospital, and that he was HIV-positive. Gelke suggested that, to be sure, they both get tested for HIV. They did, and Gelke tested negative, while Gonzalez tested positive. Gelke testified that they had many discussions about dealing with the illness and living with HIV before beginning their sexual relationship, near the end of December 1999. She testified that they always used condoms.

{¶ 23} Gonzalez and Gelke continued an on-and-off dating relationship through April 2001. Gelke testified that they sometimes separated due to typical relationship difficulties, and that Gonzalez once went back to his home country, Panama, for several months to visit his father, who was ill.

{¶ 24} Gelke testified that in April 2001, while she and Gonzalez were having sex, the condom they were using broke. Gelke testified that both she and Gonzalez were very afraid that she had been exposed. She stated that they both agreed that they should separate due to the stress of maintaining an intimate relationship. Gonzalez testified that Gelke broke up with him because she was scared to have sex with him after the accident.

{¶ 25} Also in his defense, Gonzalez presented the testimony of his sister, Jacibe Gonzalez, as well as Kevin Drummond, Gonzalez's case manager at AVOC (AIDS Volunteers of Cincinnati). Both testified that Gonzalez knew and understood that he was infected with a deadly disease. They both testified that Gonzalez knew and understood that he always needed to take precautions when engaging in sexual relations, and that he knew that he must always disclose his condition to any sexual partner beforehand.

{¶ 26} Cincinnati Police Officer Dionne Winfrey was also called by Gonzalez as a witness. Winfrey was the officer Alvarado contacted in July 2001. Winfrey took Alvarado's statement concerning the events between Gonzalez and Alvarado, and initiated an investigation. She attempted to locate Gonzalez, who by this time was in jail in Kentucky on immigration charges. Winfrey requested and received Gonzalez's medical records. Once she received them, she forwarded Alvarado's statement and the medical records to her superiors, which eventually led to four counts of felonious assault against Gonzalez.

## V. Jury Questions, Verdicts, and Sentence

{¶ 27} The four counts of felonious assault were for each month—April, May, June, and July—that Gonzalez allegedly engaged in sexual conduct with Alvarado without disclosing to her his HIV-positive status. While deliberating, the jury posed three questions to the court regarding the jury instructions: (1) Did Gonzalez testify to having sex in July with Maria? (2) What was the court's definition of disclosure? and (3) Did Gonzalez need to disclose on each count?

{¶ 28} In response to question one, the court stated that the jurors would have to rely on their collective memories to answer the question. (They evidently concluded that there was no sex in July, or could not find that sex had occurred beyond a reasonable doubt, because they acquitted Gonzalez for that count.) With regard to question two, the court indicated that all the definitions were provided in the instructions that the jury already had. The court correctly stated that any term not specifically defined should be given its ordinary meaning in the English language. With regard to the third question, the court stated that, in order to find Gonzalez guilty, the jury had to find that Gonzalez failed to disclose that he was a carrier of the virus that caused AIDS. The court further stated that the failure to disclose was an essential element of each count.

{¶ 29} The jury found Gonzalez guilty on counts 2 and 3 (for the months of May and June), but acquitted Gonzalez on counts 1 and 4 (for the months of April and July). The trial court imposed an eight-year sentence for each count, to run consecutively, and adjudicated Gonzalez a sexually oriented offender.

## VI. Constitutionality of Statute

### A. Not Void for Vagueness

{¶ 30} Gonzalez now raises eight assignments of error. First, he argues that the felonious-assault statute under which he was convicted is unconstitutional. He contends that the statute is void for vagueness, that it violates prohibitions against cruel and unusual punishment, and that it denies due process because it does not provide for an affirmative defense.

{¶ 31} The void-for-vagueness doctrine ensures that individuals can ascertain what the law requires of them.[2] In order to survive a void-for-vagueness challenge, the statute must be written so that a person of common intelligence can determine what conduct is prohibited, and the statute must provide sufficient standards to prevent arbitrary and discriminatory enforcement.[3] All legislative enactments are given a strong presumption of constitutionality.[4] The burden is on Gonzalez to prove beyond a reasonable doubt that the statute is unconstitutionally vague.[5]

{¶ 32} The challenged statute is the amendment to the felonious-assault statute.[6] It states, "No person, with knowledge that the person has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome, shall knowingly do any of the following: * * * Engage in sexual conduct with another person without disclosing that knowledge to the other person prior to engaging in the sexual conduct." (Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another.")[7]

{¶ 33} Gonzalez argues that the legislature did not specifically define what constitutes "disclosure" or define the requisite disclosure necessary to avoid criminal prosecution. He claims that his argument is bolstered by the fact that two of the questions from the jury during its deliberations concerned disclosure. The jury's first relevant question was, "What is the court's definition of disclosure?" The second was, "Did he need to disclose on each count?"

{¶ 34} But the word "disclose" is not a confusing word or a word unfamiliar outside a courtroom. A person of common intelligence would know that to "disclose" is to reveal or make known—and that the statute requires a person who has knowledge that he is HIV-positive to tell his sexual partner that he (or she) is HIV-positive before engaging in sexual conduct with that partner. As the court instructed the jury, a person hearing or reading the word "disclose" in the

---

2. See *State v. Williams* (2000), 88 Ohio St.3d 513, 532, 728 N.E.2d 342.

3. Id.

4. See *State v. Collier* (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552.

5. Id.

6. R.C. 2903.11(B)(1).

7. R.C. 2907.01(A).

statute would likely give the word its ordinary meaning in the English language. It is clear what is necessary to comply with the statute.

{¶ 35} Gonzalez next argues that it is unclear from the statute whether verbal disclosure is sufficient, and that, to be sure to avoid prosecution, an individual might be required to obtain a signed and notarized acknowledgement from his partner before engaging in each sexual encounter. These arguments are disingenuous. A person of common intelligence would understand that verbal disclosure effectively and sufficiently reveals the information. A person of common intelligence would also understand that once the person being told hears and comprehends the information, the person is not likely to forget such a significant revelation, and does not need to be told each time before further intimacies. When such an important fact is known, it is not likely to be unknown anytime soon. Disclosure, once made, would negate guilt for any subsequent contact.

{¶ 36} Gonzalez further argues that the jury's verdict acquitting him on the April count of felonious assault, while finding him guilty on the May and June counts, is proof that the jury was confused by the statute and believed that disclosure was necessary each time an HIV-infected person engaged in sexual conduct with the same person, even if the HIV was previously revealed. Gonzalez argues that the jury must have believed that he disclosed in April, thus the acquittal, yet believed that he did not disclose in May or June, and that, therefore, the earlier disclosure did not carry over.

{¶ 37} But the jury also acquitted him for July, which would make no sense under that argument. Surely the jury did not believe that he disclosed again in July. If it believed his testimony—that he disclosed before any intimacy—it certainly did not believe that he redisclosed in July. The only rational explanation for the jury verdicts is the question of time—it was unclear whether Gonzalez and Alvarado had sex in April and July—the jury could not pin down the dates.

{¶ 38} The court did instruct the jury that failure to disclose was an essential element of each count. This was a correct statement of the law, because the state had the burden of proving each element, including a lack of disclosure, for each count of felonious assault. But while the state has to prove for each count that disclosure was not made, the reverse is not true. Once a defendant can demonstrate that disclosure was made to a particular partner, then the element of failure to disclose cannot be proved by the state for any of the defendant's future sexual encounters with that same partner. The trial court should have clarified this point for the jury. But it is only common sense that

once information is disclosed, it is no longer secret. An earlier disclosure would clearly negate the need to disclose again at a later time.

{¶ 39} We are not convinced that the jury's question concerning disclosure on each count, the court's response to that question, or the jury verdicts themselves demonstrate that the jury came away with a mistaken notion concerning what conduct was prohibited by the statute. A person of common intelligence reading the statute would understand that once an HIV-positive person has told a particular sexual partner his HIV status, there is no need to restate it to that particular partner before each sexual encounter.

{¶ 40} Therefore, we are convinced that use of the word "disclosing" in the statute, without further definition, does not create an unconstitutionally vague statutory scheme where a person of common intelligence would not be able to determine what conduct is prohibited. We are also satisfied that the statute provides sufficient standards to prevent arbitrary and discriminatory enforcement. In light of the strong presumption favoring constitutionality, we conclude that Gonzalez has failed to demonstrate that the felonious-assault statute is void for vagueness.

{¶ 41} Furthermore, we note that many other states have enacted statutes that criminalize engaging in sexual conduct with a person without disclosing to the person the perpetrator's known HIV-positive status. A number of these statutes have been challenged on void-for-vagueness grounds, and all have been upheld.[8]

### B. Not Cruel or Unusual

{¶ 42} Gonzalez argues that the statute is unconstitutional because it violates the Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution, which prohibit the infliction of cruel and unusual punishments. Gonzalez argues that because the statute can punish an individual who acts without intent and knowledge, any punishment levied upon the individual is excessive and beyond any rational purpose for which the statute was designed.

{¶ 43} Gonzalez's argument that any individual could act "without intent or knowledge" and yet be punished under the statute is apparently a circular argument to his void-for-vagueness claim. That is, he contends that because the statute is vague, it is possible that an individual could not know and not intend

---

8. See *State v. Keene* (Iowa 2001), 629 N.W.2d 360; *People v. Russell* (1994), 158 Ill.2d 23, 196 Ill.Dec. 629, 630 N.E.2d 794; *State v. Mahan* (Mo.1998), 971 S.W.2d 307; *State v. Gamberella* (La.App.1993), 633 So.2d 595; *People v. Jensen* (1998), 231 Mich.App. 439, 586 N.W.2d 748; *State v. Stark* (1992), 66 Wash.App. 423, 832 P.2d 109.

that his actions would be criminal conduct, yet face criminal punishment. In that event, *any* punishment would be cruel.

{¶ 44} Because we have already held that the statute is not void for vagueness, and that a person of common intelligence would be able to determine what conduct the statute prohibits, Gonzalez's argument lacks merit. The statute does not violate the prohibition against cruel and unusual punishments.

## C. Due Process

 {¶ 45} Gonzalez argues that the felonious-assault statute is unconstitutional because it violated his due-process rights by not providing an affirmative defense. Gonzalez correctly recognizes that several other state statutes criminalizing the transmission of HIV set forth an affirmative defense for an accused when the person exposed is aware of the accused's HIV status.[9] But he is wrong to assert that he was denied his fundamental right to defend himself because the Ohio statute lacks the affirmative defense.

{¶ 46} What Gonzalez fails to note is that the state statutes that offer the affirmative defense do so because the prohibited criminal conduct consists merely of an HIV-infected person engaging in sexual conduct with another. The state in those jurisdictions can prosecute any HIV-infected person for engaging in sexual conduct with another, with no need to demonstrate, as Ohio prosecutors must, that the defendant failed to disclose his or her HIV status. To avoid conviction in those other states, the accused bears the burden of presenting an affirmative defense that he or she disclosed the HIV status before engaging in the sexual conduct. Here, the prosecutor must prove nondisclosure as an element of the offense itself.

{¶ 47} We fail to see how Gonzalez has been deprived of a fundamental right to defend himself because Ohio's statute places a higher burden on the state and a lower burden on the accused than those in other jurisdictions. The Ohio felonious-assault statute is not unconstitutional on due-process grounds.

{¶ 48} We have determined that all of Gonzalez's arguments that the amended felonious-assault statute is unconstitutional fail and, therefore, we hold that the statute is constitutional. Accordingly, we overrule the first assignment of error.

## VII. Medical Records

{¶ 49} In his second assignment, Gonzalez contends that the trial court erred by allowing the medical records of his HIV-positive status to be admitted in evidence. Gonzalez makes two arguments. First, he argues that the state did not follow the statutory scheme under R.C. 3701.243 for disclosure of HIV test

---

9. See, e.g., Iowa Code Ann. 709C.1; Ill.Ann.Stat., Chapter 720, 5/12–16.2.

results. Second, he claims that, even had the state properly complied with the statute, his medical records were inadmissible because they were protected by the doctor-patient privilege.

### A. Statutory Scheme

{¶ 50} The general rule stated in R.C. 3701.243(A) is that no person should disclose or compel another to disclose the identity of an individual tested for HIV, the results of an HIV test, or the identity of an individual diagnosed with AIDS or an AIDS-related condition. It is a statute to protect the privacy of medical records concerning HIV. The statute then provides exceptions to the general rule, allowing disclosure to specified people. Under R.C. 3701.243(B)(1)(h), HIV test results may be disclosed "[t]o law enforcement authorities pursuant to a search warrant or a subpoena issued by or at the request of a grand jury, a prosecuting attorney, a city director of law or similar chief legal officer of a municipal corporation, or a village solicitor, in connection with a criminal investigation or prosecution."

{¶ 51} The state argues that this section allows it not only to obtain medical records, but also to use the records as evidence in a case. It argues that the clear intent of the statute is to override the doctor-patient privilege concerning AIDS testing and treatment when a person has been charged in a criminal prosecution relating to his HIV status. Otherwise, it argues, the disclosure statute would be rendered meaningless. But there is more to the statute.

{¶ 52} Under R.C. 3701.243(C), "Any person or government agency may seek access to or authority to disclose the HIV test records of an individual in accordance with the following provisions: (a) The person or government agency shall bring an action in a court of common pleas requesting disclosure of *or authority to disclose* the results of an HIV test of a specific individual, who shall be identified in the complaint by a pseudonym but whose name shall be communicated to the court confidentially, pursuant to a court order restricting the use of the name. * * * (b) The court may issue an order granting the plaintiff access to or authority to disclose the test results only if the court finds by clear and convincing evidence that the plaintiff has demonstrated a compelling need for disclosure of the information that cannot be accommodated by other means. In assessing the compelling need, the court shall weigh the need for disclosure against the privacy right of the individual tested and against any disservice to the public interest that might result from the disclosure, such as discrimination against the individual or the deterrence of others from being tested." (Emphasis added.)

{¶ 53} Unfortunately, though not unusually, the statute is not clear. Section (B) obviously pertains to criminal matters, while section (C) also contemplates

civil matters. The state argues that because this was a criminal matter, compliance with section (B) was enough, and section (C) was inapplicable.

{¶ 54} But we conclude that the state should have complied with section (C) of the statute and obtained a court order granting *disclosure* due to a compelling need before it disclosed Gonzalez's HIV test results in open court or otherwise. Section (B) of the statute allows the information to be *disclosed to* law enforcement authorities in connection with a criminal investigation. Section (C) allows a person or government agency *to disclose* the HIV test records of an individual. Section (C) provides privacy protections for the individual tested, while allowing a court, on a case-by-case basis, to determine whether there is a compelling need for disclosure by a plaintiff—government or otherwise.

{¶ 55} We believe that the legislature did not intend to strip away all privacy protections for an individual merely because the individual is a defendant in a criminal matter. But the legislature contemplated the need for disclosure in certain circumstances, such as a prosecution related to HIV status. To balance the privacy and public interests, section (C) allows disclosure after the proper showing of compelling need.

{¶ 56} The language of the statute supports our conclusion. Section (B) allows the test results to be disclosed to law enforcement authorities—but only under a subpoena—an official court document. It gives *them* no authority to disclose those results to others. Section (C), on the other hand, specifically grants "authority to disclose" the results if a common pleas judge finds compelling need. Thus, section (B) applies to investigations only—section (C) must be followed to allow any *further* disclosure.

{¶ 57} Therefore, investigational discovery requires an official subpoena—but further disclosure, certainly including evidence in court, requires a finding by a judge of compelling need for the disclosure. Section (C), of course, is also applicable in noncriminal matters.

### B. Other States' Statutes

{¶ 58} Our conclusion is bolstered by looking to other states and their HIV-disclosure statutes. Louisiana has a statute that allows a court to authorize disclosure of confidential HIV test results.[10] The statute states, "A court may grant an order for disclosure of confidential HIV test results upon an application showing * * * [a] compelling need for disclosure of the information for the adjudication of a criminal or civil proceeding." Louisiana also has a law criminalizing the intentional exposure to the AIDS virus, which states, "No person shall

---

10. La.Rev.Stat. 40:1300.15(B)(1).

intentionally expose another to any acquired immunodeficiency syndrome (AIDS) virus through sexual contact without the knowing and lawful consent of the victim." [11]

{¶ 59} In a Louisiana case, a defendant charged with intentionally exposing another to AIDS sought to suppress all evidence concerning the results of tests performed on his blood.[12] The state argued that, under the Louisiana disclosure statute, there was a compelling need to disclose the test results, since it was essential for the adjudication of the criminal proceeding. The trial court held a hearing on both the defendant's motion to suppress and the state's motion for disclosure, and granted the state's motion. The appellate court affirmed the trial court's decision, stating that "the state's interest in prosecuting defendant for his violation of La.R.S. 14:43.5 outweighed defendant's interest in maintaining the confidentiality of his test results." [13]

{¶ 60} Similarly, New York's HIV-disclosure statute states, "A court may grant an order for disclosure of confidential HIV related information upon an application showing * * * a compelling need for disclosure of the information for the adjudication of a criminal or civil proceeding." [14] In a civil suit alleging wrongful transmission of the HIV virus, a New York appellate court held that there was a compelling need for disclosure of the defendant's confidential HIV-related information where the information was necessary to prove that the defendant was infected with the HIV virus and that he knew or should have known that he was infected when he allegedly exposed the plaintiff to it.[15]

{¶ 61} We also note that several other states have statutes allowing for the disclosure of HIV-related information upon proper application to a court and a judicial determination that there is a compelling need for such disclosure.[16]

### C. Statute Not Followed

{¶ 62} It is not enough for a prosecuting attorney to subpoena the HIV test results under R.C. 3701.243(B). Section (B) merely allows the information to be disclosed to the prosecuting attorney, enabling the state to determine whether

---

11. La.Rev.Stat. 14:43.5(A).

12. *State v. Gamberella* (La.App.1993), 633 So.2d 595.

13. Id. at 601.

14. N.Y. Pub. Health L. 2785(2)(a).

15. *Plaza v. Estate of Wisser* (1995), 211 A.D.2d 111, 626 N.Y.S.2d 446.

16. See Ariz.Rev.Stat.Ann. 36–665(B)(1); Mo.Rev.Stat. 191.657(2)(1); Pa.Stat., Title 35, 7608(a)(1); Conn.Gen.Stat.Ann. 19a–583(a)(10).

there are grounds to pursue a criminal case. But at that point, the information is still confidential.

{¶ 63} For the state to disclose the HIV test results and to admit them into evidence at trial, the state must follow section (C) of the statute and bring an action in a common pleas court requesting disclosure, and the court must order disclosure of the test results by finding, by clear and convincing evidence, that the state has a compelling need for disclosure. We see no reason why the state could not have complied with R.C. 3701.243(C) by moving for disclosure as part of the criminal case against Gonzalez; and we assume that the trial court would have found compelling need.

{¶ 64} There is no dispute that the state in this case failed to bring an action in the trial court requesting disclosure of Gonzalez's HIV test results. Because the state failed to comply with the requirements of R.C. 3701.243, the trial court erred in admitting Gonzalez's medical records into evidence.

### D. Harmless Error

{¶ 65} We must next consider whether the trial court's error in admitting the HIV test results without compliance with R.C. 3701.243(C) was prejudicial or harmless.[17] Under the "harmless error" rule, a judgment will not be reversed because of nonconstitutional error that does not affect substantial rights of the defendant.[18] This language has been interpreted to mean that the error must materially prejudice the complaining party.[19] To be prejudicial, an error must have affected the outcome of the trial proceedings.[20] Put another way, we must look at the whole record in this case, without the disputed evidence, and decide whether the remaining evidence would have resulted in guilty verdicts.[21]

{¶ 66} Gonzalez's medical records provided evidence that was essentially cumulative to that provided by Gonzalez's sister, ex-girlfriend, and Gonzalez himself. All three testified that Gonzalez was HIV-positive and knew it. From the whole record, Gonzalez's HIV-positive status and knowledge were not even contested issues.

---

17. See *State v. Davis* (1975), 44 Ohio App.2d 335, 343, 73 O.O.2d 395, 338 N.E.2d 793.

18. Crim.R. 52(A); *State v. Davis*, supra, 44 Ohio App.2d at 348, 73 O.O.2d 395, 338 N.E.2d 793.

19. See *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, at ¶ 7.

20. Id.

21. See *State v. Davis* (1975), 44 Ohio App.2d 335, 347, 73 O.O.2d 395, 338 N.E.2d 793.

{¶ 67} But Gonzalez moved for an acquittal under Crim.R. 29 at the close of the state's case-in-chief. We must, therefore, first look only at the evidence presented by the state in its case-in-chief, and not consider any of the witnesses who testified for the defense.

{¶ 68} A Crim.R. 29 motion is a challenge to the sufficiency of the state's evidence. We must look at the evidence the state presented to the jury and determine whether the state offered evidence on each element of the crime that, if believed, would have convinced the average mind of Gonzalez's guilt beyond a reasonable doubt.[22] In this case, the state had to prove that Gonzalez was HIV-positive, that he knew it, and that he engaged in sexual conduct with Alvarado without disclosing his HIV status to her.

{¶ 69} The state's only evidence, other than the medical records and medical testimony, was Alvarado's testimony. Alvarado testified that she did not have HIV before she had sex with Gonzalez, that she did not have sex with any other person while she was dating Gonzalez, and that she was HIV-positive at the end of her relationship with Gonzalez. (As we later determine, this evidence was inadmissible if Gonzalez's HIV-positive status was not an issue. If, however, there were no other evidence of Gonzalez's status, Alvarado's testimony that she was HIV-negative before, had sex only with Gonzalez, and was positive after, would have been relevant—and its relevance would not have been outweighed by the prejudice.)

{¶ 70} Alvarado testified that Gonzalez never told her that he was HIV-positive. She also testified that Gonzalez's friend Carlos told her that Gonzalez had AIDS, and that another of Gonzalez's friends, Elizabeth Shrader, told her that Gonzalez was sick. While Alvarado's testimony about what the two friends had told her could have been hearsay, neither statement was objected to at trial.

{¶ 71} We conclude that, while not overwhelming, there was sufficient evidence in the state's case-in-chief without the medical evidence to support Gonzalez's convictions for felonious assault. Alvarado's testimony alone provided enough evidence that reasonable minds could have concluded that Gonzalez had HIV, knew that he had HIV, and engaged in sexual conduct with Alvarado without disclosing his HIV status to her.

{¶ 72} Accordingly, we hold that, for the purpose of the Crim.R. 29 motion, the medical records were not determinative, and their admission was harmless error because they did not affect the outcome of Gonzalez's trial. Of course, Gonzalez and his witnesses later testified to his status, removing any possible doubt.

---

22. See State v. Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

### E. Doctor–Patient Privilege

{¶ 73} We have determined that had the state complied with the requirements of R.C. 3701.243(C), and had the trial court determined that there was a compelling need for disclosure of Gonzalez's medical records, it would have been proper for the trial court to admit the records into evidence. The next issue raised by Gonzalez is whether the statute, even when properly complied with, is enough to abrogate the doctor-patient privilege.

{¶ 74} Under R.C. 2317.02(B), "The following persons shall not testify in certain respects: * * * (B) A physician or a dentist concerning a communication made to the physician or dentist by a patient in that relation or the physician's or dentist's advice to a patient."

{¶ 75} The purpose of the doctor-patient privilege "is to encourage patients to make a full disclosure of their symptoms and condition to their physicians without fear that such matters will later become public." [23] While the purpose of the privilege is laudable, the privilege may not be invoked automatically in all circumstances. The common law traditionally extended no testimonial privilege to the physician-patient relationship.[24] Consequently, the privilege set forth in R.C. 2317.02(B) is in derogation of the common law and must be strictly construed against the person asserting it.[25]

{¶ 76} In addition, there are numerous statutory exceptions to the privilege, which, if applicable, trump the privilege. The most obvious is the express consent of the patient. Perhaps because there are many exceptions to the privilege, the law on when the privilege can be waived, and by what authority, has not always been certain.

{¶ 77} Because the privilege is created by statute, the legislature has the authority to create a statutory exception that waives the doctor-patient privilege. For example, the privilege statute cites R.C. 2151.421 as an exception to the privilege. Situations under R.C. 2151.421 include when a doctor confronts injuries, abuse, or neglect involving juveniles. In those cases, the statute states that the "patient is deemed to have waived any testimonial privilege under division (A) or (B) of section 2317.02 of the Revised Code." [26] (More accurately,

---

**23.** See *State v. Antill* (1964), 176 Ohio St. 61, 64–65, 26 O.O.2d 366, 197 N.E.2d 548.

**24.** See *State Med. Bd. of Ohio v. Miller* (1989), 44 Ohio St.3d 136, 140, 541 N.E.2d 602. See, also, *Boyle v. Northwestern Mut. Relief Assn.* (1897), 95 Wis. 312, 70 N.W. 351; *Louisville & N.R. Co. v. Crockett's Admx.* (Ky.App.1930), 232 Ky. 726, 24 S.W.2d 580.

**25.** See *State Medical Board of Ohio v. Miller*, supra.

**26.** R.C. 2151.421(A)(2).

the statute should simply state that the privilege does not apply in those circumstances—how the patient is "deemed to have waived" is at best unclear.)

{¶ 78} The privilege statute also has a specific exception that allows law enforcement officers to request and receive from health-care providers the test results administered to determine the presence or concentration of alcohol or drugs in a person's blood, breath, or urine.[27] And while not listed in the privilege statute as an exception, R.C. 2921.22 waives the doctor-patient privilege and requires a physician to report to law enforcement authorities any gunshot or stab wound treated or observed by the physician, or any serious physical harm to persons that the physician knows or reasonably believes resulted from an offense of violence. The statute several times states that the doctor-patient privilege is not a ground for excluding evidence.[28]

.{¶ 79} When the legislature wishes to create an exception to the statutory doctor-patient privilege, it can and will do so. In *State v. Smorgala,*[29] the Ohio Supreme Court made it clear that only the legislature has the authority to create exceptions to the privilege. In *Smorgala,* the court held that public-policy limitations upon the physician-patient privilege may not be judicially created in order to allow otherwise clearly inadmissible evidence to be received in driving-under-the-influence cases.[30]

{¶ 80} *Smorgala* ended a long line of cases where courts had carved out a public-policy exception to the privilege statute for test results involving alcohol and drugs.[31] Those courts had relied on *State v. Antill,* where the Ohio Supreme Court stated, "Against the interest of the patient in having his condition remain confidential, must be balanced the interest of the public in detecting crimes in order to protect society."[32] The courts in the impaired-driving cases had reasoned that the privilege was "not absolute and must yield when the public interest outweighs the policy considerations supporting the privilege. * * * To allow the privilege to be invoked so as to exclude evidence tending to prove that

---

27. R.C. 2317.02(B)(2)(a).

28. R.C. 2921.22(E)(5) and (F)(2).

29. See *State v. Smorgala* (1990), 50 Ohio St.3d 222, 553 N.E.2d 672.

30. Id., paragraph one of the syllabus.

31. See *State v. Boysaw* (1987), 40 Ohio App.3d 173, 176, 532 N.E.2d 154; *State v. Dress* (1982), 10 Ohio App.3d 258, 10 OBR 372, 461 N.E.2d 1312; *State v. Tu* (1984), 17 Ohio App.3d 159, 17 OBR 291, 478 N.E.2d 830; *State v. Kavlich* (1986), 33 Ohio App.3d 240, 515 N.E.2d 652.

32. See *State v. Antill,* supra, 176 Ohio St. at 65, 26 O.O.2d 366, 197 N.E.2d 548.

appellant was driving while intoxicated would be against the public interest and would not serve the purpose of R.C. 2317.02(B)." [33]

{¶ 81} Some courts had also reasoned that "[b]y tendering a plea of 'not guilty' to the offense charged, appellant thereby placed in issue each essential element, including (obviously) the element requiring proof of his intoxication. In other words, his plea of 'not guilty' put his *physical condition* in issue. * * * To allow the privilege to suppress that evidence would be to thwart the state's ability to offer *the best evidence* of guilt; it would, moreover, permit a defendant to evade the penalties therefor with impunity." [34]

{¶ 82} Despite these arguments, the Ohio Supreme Court in *Smorgala* held that the balancing test between the public interest and the privilege applied only when a court was faced with conflicting legislatively created policies.[35] In the driving-under-the-influence cases, the courts had attempted to balance a legislative policy establishing the privilege with a judicial policy limiting its application. The *Smorgala* court properly held that judicial limitations on the doctor-patient privilege were improper and stated that courts could look no further than the privilege statute itself, or other statutes, to determine when the privilege could be abrogated.[36] In response to *Smorgala*, the legislature quickly amended the privilege statute to allow law enforcement to obtain, and courts to admit, medical test results for alcohol and drugs.[37]

{¶ 83} In *State v. Jones*,[38] the Ohio Supreme Court clarified that, despite *Smorgala*, *Antill*'s balancing test—where the public interest in detecting crime could outweigh the policy considerations of the doctor-patient privilege—could still apply where two statutes conflicted. In that case, the court held that the R.C. 2921.22 requirement that doctors report gunshot and stab wounds was not trumped by the privilege statute.[39] Unlike in *Smorgala*, the limitation on the privilege in *Jones* was created by the legislature. The court cited the comment

33. See *State v. Dress* (1982), 10 Ohio App.3d 258, 261, 10 OBR 372, 461 N.E.2d 1312.

34. See *State v. Tu* (1984), 17 Ohio App.3d 159, 163, 17 OBR 291, 478 N.E.2d 830.

35. See *State v. Smorgala*, supra, 50 Ohio St.3d at 224, 553 N.E.2d 672.

36. Id. at 223, 553 N.E.2d 672.

37. See *State v. Slageter* (Mar. 31, 2000), 1st Dist. No. C–990584, 2000 WL 331633; *State v. Meyers*, 146 Ohio App.3d 563, 2001-Ohio-2282, 767 N.E.2d 739, at ¶ 39; *State v. Hodge* (Nov. 29, 1999), 12th Dist. Nos. CA99–01–001 and CA99–01–002, 1999 WL 1087021.

38. See *State v. Jones* (2000), 90 Ohio St.3d 403, 739 N.E.2d 300.

39. Id. at 409, 739 N.E.2d 300.

to R.C. 2921.22, stating that "the reporting requirement under this part of the section is absolute, i.e., no privilege attaches in the cases covered." [40]

{¶ 84} Therefore, whether the doctor-patient privilege could be invoked by Gonzalez in this case to prevent the admission of his medical records or the testimony of his physicians depended on whether R.C. 3701.243 is a sufficient legislative expression of an exception to the doctor-patient privilege. If it is not, the privilege was not abrogated, and, despite compliance with the procedures of the disclosure statute, Gonzalez's medical records would have been improperly admitted into evidence without his consent.

[20] {¶ 85} Unfortunately, there is no mention of the privilege, or of its waiver, in R.C. 3701.243. In the other statutory exceptions to the privilege previously discussed—treatment for injuries to children, treatment of gunshot or stab wounds, and alcohol and drug testing—the legislature has specifically abrogated the privilege in the statute. It knows how to do it. And unless the legislature acts to waive the privilege, it is not for courts to create judicial waivers.

{¶ 86} But slovenly drafting is the hallmark of the "Revised Code." We are left to interpret what, if anything, the legislature might have meant. Because the statutes conflict, we have no choice.

{¶ 87} Like *Jones,* and unlike *Smorgala,* there is a statute in this case that conflicts with the privilege statute, which means that *Antill's* balancing test applies.[41] The public interest is evident. The legislature has created a crime of felonious assault where the state must prove that the defendant knew he was HIV-positive when he engaged in sexual conduct with another without disclosing his condition. The legislature has also created a statute allowing for disclosure of confidential HIV test results when a court decides that there is a compelling need for disclosure that cannot be accommodated by other means.

{¶ 88} We note that a New York appellate court has considered whether New York's disclosure statute, which is similar to Ohio's, overcomes the doctor-patient privilege to allow the disclosure of HIV-related information.[42] The court concluded that "a plain reading of the Public Health Law provision, as well as logic and fairness, compel a conclusion that it supersedes the physician-patient privilege. * * * It clearly and unambiguously—and without limitation—provides that, under certain circumstances, a court may order the disclosure of confidential HIV

40. Id.

41. Id.

42. *Plaza v. Estate of Wisser,* supra.

related information. * * * Once the court has determined that there exists a 'compelling need for disclosure of the information for the adjudication of a criminal or civil proceeding,' [citation omitted] its inquiry is at end." [43]

{¶ 89} We agree with the New York court's analysis. The very purpose of R.C. 3701.243 is to allow disclosure of confidential information, given that proper procedures have been followed. Though the legislature did not explicitly waive the doctor-patient privilege in R.C. 3701.243, we conclude that had the state properly followed the procedures of the statute, and had a court found a compelling need for disclosure, Gonzalez's medical records could have been properly admitted into evidence. In that event, R.C. 3701.243 trumps the medical privilege.

{¶ 90} Because it was harmless error for the trial court to admit Gonzalez's medical records into evidence when the statute for disclosure was not followed, and because R.C. 3701.243 waives the doctor-patient privilege preventing disclosure, we overrule Gonzalez's second assignment of error.

### VIII. Prejudicial Testimony

{¶ 91} In his third assignment of error, Gonzalez argues that he was unduly prejudiced by the trial court's decision to allow the jury to hear testimony that Alvarado, the victim, was HIV-positive. Prior to trial, Gonzalez moved in limine to prohibit any testimony concerning Alvarado's HIV status. The motion was overruled, and Alvarado testified at trial that she was not HIV-positive before having sex with Gonzalez, but that she was HIV-positive afterwards.

{¶ 92} Gonzalez argues that Alvarado's HIV status was irrelevant and, therefore, was inadmissible. He is correct.

{¶ 93} Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[44] Evidence that is not relevant is not admissible.[45]

{¶ 94} We conclude that the only possible relevance of Alvarado's testimony would have been if there were no other evidence that Gonzalez was HIV-positive. Alvarado's testimony concerning the fact that she was now HIV-positive, but was not infected before having sex with Gonzalez, could only have been relevant to the determination of whether Gonzalez was HIV-positive.

---

43. Id. at 122–123, 626 N.Y.S.2d 446.

44. Evid.R. 401.

45. Evid.R. 402.

{¶ 95} At trial, Gonzalez's medical records were admitted into evidence, establishing the fact that Gonzalez was HIV-positive when he met and dated Alvarado. Therefore, the state had no need to introduce the inflammatory testimony that Alvarado was currently infected with HIV, most likely from Gonzalez. Even if the medical records and the medical testimony had been properly excluded from evidence, the state could still have called any number of witnesses, such as Gonzalez's sister or ex-girlfriend, to establish that Gonzalez was HIV-positive and knew it before he met Alvarado, without needing to rely on Alvarado's testimony that she was now HIV-positive. Because the trial court allowed Gonzalez's medical records to be admitted into evidence, Gonzalez's HIV status was not at issue at the trial. Therefore, we fail to see the relevancy of Alvarado's testimony.

{¶ 96} The state argues that Alvarado's current condition was "background information" necessary to give the jury the setting of the case. The state asserts that, without this information, the jury would have had to make its decision in a void. This argument is feckless. It is the old "background" canard that has somehow grown up in this county over the years, and seems to fool many people. But there is no separate Hamilton County common law, and this intelligence-insulting argument exists nowhere else.

{¶ 97} The jury needed to determine only whether an HIV-positive individual, who knew he was HIV-positive, engaged in sexual conduct with another person without disclosing to the other person that he was HIV-positive. It was not necessary to decide whether the victim developed HIV, experienced emotional distress, or suffered any consequences from the sexual encounter. The jury had no need to know whether the victim in this case later developed HIV. As soon as the sexual conduct occurred without disclosure, the crime was committed.

{¶ 98} Alvarado's testimony concerning her HIV status was irrelevant to any fact necessary for the determination whether Gonzalez had committed felonious assault. Under these circumstances, we hold that the trial court erred by allowing Alvarado to testify about her HIV status.

{¶ 99} As with the erroneous admission of Gonzalez's medical records, we must now determine whether the trial court's error in admitting Alvarado's testimony was harmless or prejudicial. We may reverse Gonzalez's conviction only on the basis of a trial error if the error materially prejudiced him, which means that the error must have affected the outcome of the trial.[46] We must look at the whole record, without the disputed evidence, and decide whether there was otherwise substantial evidence to support the guilty verdicts.[47]

---

46. See *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, at ¶ 7.

47. See *State v. Davis* (1975), 44 Ohio App.2d 335, 347, 73 O.O.2d 395, 338 N.E.2d 793.

{¶ 100} If the jury had not been told of Alavarado's HIV status, we believe that the outcome of Gonzalez's trial would have been the same. The state provided substantial evidence that, in May and June, Gonzalez was HIV-positive, knew he was HIV-positive, and engaged in sexual conduct with Alvarado without disclosing his HIV status. We admit that the revelation that Alvarado had developed HIV was tragic, and that it no doubt created sympathy in the jurors for Alvarado. But we cannot believe that the jury's verdicts were based on this sympathy. The jury's verdicts were likely based on the substantial evidence the state presented for each element of the crimes.

{¶ 101} Therefore, we hold that Gonzalez was not prejudiced by the trial court's error in allowing Alvarado to testify about her current HIV status, and that the error was harmless. We caution that while in this case the erroneously allowed testimony was harmless, if the evidence of an accused's guilt either is weak or presents a close call, the same error would be prejudicial, mandating that we reverse and order a new trial. We admonish prosecutors to refrain from injecting such inflammatory and irrelevant testimony into a trial in a misguided attempt to influence the jury.[48]

{¶ 102} Because we hold that the admission of Alvarado's testimony in this case was harmless error, we overrule Gonzalez's third assignment of error.

### IX. Inconsistent Jury Verdicts

{¶ 103} In his fourth assignment of error, Gonzalez argues that the trial court's jury instructions allowed the jury to return inconsistent verdicts. Gonzalez contends that because the felonious-assault statute is unconstitutionally vague, the instructions given by the trial court were flawed. Gonzalez argues that these flawed instructions led to inconsistent verdicts reflecting the jury's confusion about its obligation under the law.

{¶ 104} We have already held that the statute is not unconstitutionally vague; therefore, it was not error for the trial court to give jury instructions that included the current version of the statute. As previously noted, Gonzalez argues that because the jury acquitted him on the first count, in April, the jury must have believed that he disclosed his HIV status to Alvarado in April. He then theorizes that there was no way the jury could have found him guilty on the May and June counts unless there was confusion about the law. His argument amounts to speculation.

{¶ 105} The state was required to prove a number of elements for each count of felonious assault. The jury apparently believed that the state failed to prove all the elements for the April count. But we cannot assume that one of the

48. Id. at 349–350, 73 O.O.2d 395, 338 N.E.2d 793.

elements not proven by the state was the failure to disclose. Both Gonzalez and Alvarado had difficulty remembering exactly when their sexual relationship began and when it ended. Some of the testimony on this point was contradictory. The jury could have found that it was not proven beyond a reasonable doubt that Gonzalez and Alvarado had engaged in sexual conduct in April or July, accounting for the acquittals on those counts.

{¶ 106} But it is not for us to speculate about why the jury decided as it did. "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count."[49] With few exceptions, once the jury has heard the evidence and the case has been submitted, the litigants must accept the jurors' collective judgment. "Courts have always resisted inquiring into a jury's thought processes."[50] This deference to the jury "brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality."[51]

{¶ 107} Because the jury instructions given by the trial court were not in error, we overrule Gonzalez's fourth assignment of error.

## X. Sufficiency and Weight of Evidence

{¶ 108} In his fifth assignment of error, Gonzalez argues that the trial court erred by not granting his Crim.R. 29 motion for acquittal and by entering a judgment of conviction based on insufficient evidence. In his sixth assignment of error, he argues that his conviction was against the manifest weight of the evidence.

{¶ 109} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[52] A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[53] The relevant inquiry in a claim of insufficiency is whether any rational factfinder,

---

49. See *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 683 N.E.2d 1112, paragraph one of the syllabus.

50. Id., 79 Ohio St.3d at 445, 683 N.E.2d 1112, quoting *United States v. Powell* (1984), 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461.

51. Id.

52. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

53. Id.

viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt.[54]

{¶ 110} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[55] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[56] The discretionary power to reverse should be invoked only in exceptional cases "in which the evidence weighs heavily against the conviction." [57]

{¶ 111} In Gonzalez's case, even with his doctors' inadmissible testimony discounted, Gonzalez's sister, ex-girlfriend, and AVOC case manager, as well as Gonzalez himself, testified that he knew that he was HIV-positive. Both Gonzalez and Alvarado testified that they engaged in sexual conduct in May and June 2001. Alvarado testified that Gonzalez did not disclose to her that he was HIV-positive before their first sexual encounter, or at anytime during their relationship.

{¶ 112} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Gonzalez had committed felonious assault. Therefore, the evidence presented was legally sufficient to sustain Gonzalez's conviction.

{¶ 113} Gonzalez offered testimony that directly contradicted Alvarado's testimony on the issue of whether Gonzalez had disclosed his HIV status to her before they engaged in sexual conduct. But the credibility of the witnesses was the province of the jury. The jury was free to believe some, all, or none of a particular witness's testimony. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Gonzalez guilty on two counts of felonious assault. Therefore, the conviction was not against the manifest weight of the evidence.

{¶ 114} Accordingly, we overrule Gonzalez's fifth and sixth assignments of error.

---

54. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

55. See *State v. Thompkins,* supra, 78 Ohio St.3d at 387, 678 N.E.2d 541.

56. See id.; *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

57. See *State v. Martin,* supra.

## XI. Sexually Oriented Offender Classification

{¶ 115} In his seventh assignment of error, Gonzalez argues that the trial court erred when it classified him as a sexually oriented offender without a hearing.

{¶ 116} Any violation of the felonious-assault statute [58] that is committed with a purpose to gratify the sexual needs or desires of the offender is a sexually oriented offense.[59] The Ohio Supreme Court has held, "The Due Process Clauses of the Fourteenth Amendment to the United States Constitution and of Section 16, Article I of the Ohio Constitution do not require a trial court to conduct a hearing to determine whether a defendant is a sexually oriented offender. Instead, according to R.C. Chapter 2950, if a defendant has been convicted of a sexually oriented offense as defined in R.C. 2950.01(D), and is neither a habitual sex offender nor a sexual predator, the sexually oriented offender designation attaches as a matter of law." [60]

{¶ 117} The trial court ruled that Gonzalez committed felonious assault with a purpose to gratify his sexual needs or desires. Therefore, by operation of law, the trial court properly adjudicated Gonzalez as a sexually oriented offender.

{¶ 118} Accordingly, we overrule Gonzalez's seventh assignment of error.

## XII. Consecutive and Maximum Sentences

{¶ 119} In his eighth and final assignment of error, Gonzalez argues that the trial court erred when it imposed consecutive maximum sentences without following the sentencing guidelines.

{¶ 120} Felonious assault is a felony of the second degree.[61] Under Ohio's sentencing scheme, the prison term for a second-degree felony is two, three, four, five, six, seven, or eight years.[62]

{¶ 121} The trial court may impose the longest prison term authorized for the offense only upon (1) offenders who have committed the worst form of the offense; (2) offenders who pose the greatest likelihood of committing future crimes; (3) certain major drug offenders; and (4) certain repeat violent offenders.[63]

---

58. R.C. 2903.11.

59. R.C. 2950.01(D)(1)(c).

60. See *State v. Hayden,* 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, paragraph two of the syllabus.

61. R.C. 2903.11(D).

62. R.C. 2929.14(A)(2).

63. R.C. 2929.14(C).

{¶ 122} When there are multiple offenses with multiple prison terms, the trial court may require the offender to serve the prison terms consecutively if the court finds that (1) the consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following applies: (a) the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing or under community control; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.[64]

{¶ 123} A trial court imposing a maximum sentence must give its reasons on the record.[65] Likewise, to impose consecutive sentences, a trial court must make its findings supporting its decision on the record.[66]

{¶ 124} At Gonzalez's sentencing hearing, the trial court considered all of the factors relative to sentencing. The trial court found that the victim suffered serious physical harm and that Gonzalez's relationship with the victim facilitated the offense. The court also noted Gonzalez's prior brushes with the law, including misdemeanor convictions for assault and for disorderly conduct while intoxicated, in addition to Gonzalez's INS detainer. The court then found that Gonzalez lacked genuine remorse for what had happened to the victim and decided that the shortest prison terms would demean the seriousness of the crimes and would not adequately protect the public.

{¶ 125} On the court's worksheet, the court noted that Gonzalez "sentenced victim to death." The court stated at the hearing that Gonzalez had committed one of the worst forms of felonious assault. Based on this finding, the trial court gave Gonzalez the maximum eight-year term for each count.

{¶ 126} The trial court then determined that consecutive terms were necessary to protect the public and to punish Gonzalez, and that consecutive terms were not disproportionate to the seriousness of his conduct and to the danger he posed to the public. The court also found that the physical harm was so great and unusual

---

64. R.C. 2929.14(E)(4).

65. R.C. 2929.19(B)(2)(d); *State v. Edmonson* (1999), 86 Ohio St.3d 324, 328, 715 N.E.2d 131.

66. R.C. 2929.19(B)(2)(c).

that a single prison term was inadequate. Finding all of the necessary factors for consecutive sentences, the court sentenced Gonzalez to two consecutive eight-year terms.

### A. Maximum

{¶ 127} Gonzalez argues that the trial court erred in imposing the maximum sentences and in ordering them to be served consecutively, because it did not follow the sentencing guidelines. An appellate court's standard of review for sentencing is not whether the sentencing court abused its discretion.[67] The appellate court may increase, reduce, or otherwise modify a sentence, or vacate and remand the matter to the sentencing court for resentencing, if it clearly and convincingly finds that the record does not support the sentencing court's findings or that the sentence is contrary to law.[68]

{¶ 128} Gonzalez argues that, while the trial court made the finding on the record that he had committed one of the worst forms of the offense, the court did not offer its reasons for such a finding. But the court stated that the victim suffered serious physical harm and that she was "sentenced to death." The trial court stated to Gonzalez at the hearing that the victim's "life has changed forever as a result of her contact with you." The court continued, "Mr. Gonzalez, sir, as far as I'm concerned, what you did was an extremely vicious crime. * * * In fact, in my opinion, sir, you showed absolutely indifference to the welfare of the victim. Was a cold and callous disregard for life, not only of her, not only of Ms. Alvarado's, but in light of the circumstances of this case and the disease we're talking about, it's complete disregard for the well-being of the entire community."

{¶ 129} We hold that the court's reasons supporting its finding that Gonzalez committed the worst form of the offense were quite clearly stated in the record.

{¶ 130} Gonzalez also argues that there was nothing in the record to support a finding that he committed the worst form of the offense. We have previously noted the difficulty of reviewing the vague concept of the "worst" form of an offense.[69] Due to its abstract nature, it is almost always possible to conceive of a worse form of the offense that could be committed.

{¶ 131} But we agree with the trial court that Gonzalez's crime can be considered one of the worst forms of felonious assault. While we certainly hope that the trial court's hyperbole that Alvarado has been "sentenced to death" does

---

**67.** R.C. 2953.08(G)(2).

**68.** Id.

**69.** See *State v. Kershaw* (1999), 132 Ohio App.3d 243, 247, 724 N.E.2d 1176; *State v. Mays* (2000), 139 Ohio App.3d 177, 180–181, 743 N.E.2d 447.

not come true, Alvarado is likely to suffer severe physical harm, possibly even death, because of the disease that Gonzalez gave her. And unlike many other serious injuries, at this point in time, there is no cure for HIV or AIDS. While many victims of felonious assault may fully recover from the injuries of a beating, a stabbing, or a shooting, the victim here most probably will not. In addition, Gonzalez used his friendship and relationship with Alvarado to perpetrate his crime and has not taken any responsibility for what has happened due to his actions.

{¶ 132} We conclude that the record supports a finding that Gonzalez committed one of the worst forms of felonious assault, and that, therefore, the trial court did not err when it imposed the maximum sentence for each count.

### B. Consecutive

{¶ 133} Gonzalez also argues that the trial court did not make any specific verbal findings that supported the imposition of consecutive sentences. But our review of the record indicates that the trial court did not merely recite the necessary findings to impose consecutive sentences. The trial court stated its findings and then supported them with its reasons.

{¶ 134} The trial court found that consecutive sentences were necessary to protect the public from crime or to punish Gonzalez, that consecutive sentences would not be disproportionate to the seriousness of his conduct and to the danger he posed to the public, and that the physical harm caused was so great and unusual that a single prison term was inadequate. The trial court stated its findings, and then elaborated on them.

{¶ 135} The court noted that Gonzalez had convictions for other crimes, and that he had an INS detainer currently on him for being in the country illegally. The court also stated that Gonzalez took no responsibility for the felonious assaults and did not show any concern for the victim. The court noted that its presentence-investigation report indicated that he had a possible substance-abuse problem. As quoted above, the trial court stated that it viewed Gonzalez's behavior as "an extremely vicious crime" and that "in light of the circumstances of this case and the disease we're talking about, it's complete disregard for the well-being of the entire community." In conclusion, the court stated, "Part of my job, sir, is to protect the public. With all due respect, I don't have enough faith in the INS situation, that if you were deported, you would, in fact, stay out of the country. So I have to do what I have to do to protect the public. You being on the street, in my opinion, sir, would be a travesty. Could, in fact, decimate the community, and I'm not going to put the community at risk."

{¶ 136} We hold that the trial court clearly gave its reasons for finding the existence of the factors supporting consecutive sentences. While we may not

totally agree with the trial court's analysis, the court did not err by failing to follow the sentencing guidelines.

{¶ 137} Gonzalez also argues that the separate convictions should have been considered only as one offense because they were part of a continuing consensual relationship with the victim. Not so. The two counts of felonious assault were two different instances of sexual conduct, conducted over two months' time. Each time, Gonzalez chose to have sex with Alvarado without disclosing his HIV status. He could have told her at any point in time, or decided not to have sex with her, but he chose to repeatedly have sex, remaining silent about his HIV each time.

{¶ 138} In essence, Gonzalez offers a type of merger argument. In support of this argument, he points out that his crimes involved the same victim and the same conduct. But a thief who steals from the same person two times, once a month for two months, has committed two separate thefts. To reason otherwise would allow a criminal a free pass—once a particular person is victimized, the thief has nothing to lose by doing it again, the same crime and same victim, the next month, and the month after that. That is not the law. Gonzalez had a separate animus each time that he engaged in sexual conduct with Alvarado while choosing not to disclose his HIV status. His two convictions cannot be considered as only one offense.

{¶ 139} We must next consider whether the record supported the imposition of consecutive sentences. We note that the law does not favor consecutive sentences. It is presumed that a court will not order consecutive sentences, unless the court makes specific findings supported by the record, one of which is that the resulting sentence is not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. We conclude that, in this case, while harsh, the 16–year sentence was not clearly disproportionate to the seriousness of Gonzalez's conduct and the danger he posed to the public. Therefore, we hold that the imposition of consecutive sentences was supported by the record.

{¶ 140} But we caution that our ruling today does not mean that consecutive sentences for multiple convictions of this form of felonious assault will always be appropriate. Consecutive sentences resulting in an extremely long term of incarceration could very well be disproportionate.

{¶ 141} We note that, in prosecutions for this type of felonious assault, it is not unlikely that a defendant would have multiple convictions. For example, in Gonzalez's case, both Gonzalez's and Alvarado's testimony indicated that they had sex several times a week for several months. Each sexual encounter without disclosure was a possible charge of felonious assault against Gonzalez. The state

conceivably could have brought 20 charges of felonious assault against him. But 20 consecutive eight-year sentences, resulting in a 160–year sentence, would certainly have been disproportionate to the seriousness of his conduct and to the danger he posed to the public. Our decision today should make it clear that this case does not stand for the proposition that consecutive sentences are always appropriate.

{¶ 142} We conclude that the trial court did not err when it ordered Gonzalez to serve the maximum sentences for his two convictions consecutively. Accordingly, we overrule his eighth assignment of error.

{¶ 143} Because we have overruled each of Gonzalez's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

SUNDERMANN, P.J., and HILDEBRANDT, J., concur.