OPINION
{¶ 1} Appellant, Dennis L. Stambolia, Sr., appeals the March 4, 2003 judgment entry of the Trumbull County Court of Common Pleas, in which he was found guilty and sentenced for rape, kidnapping, and felonious assault. Appellant was also classified as a sexually oriented offender.
 {¶ 2} On October 3, 2002, appellant was indicted by the grand jury on the following: five counts of rape with firearm and sexually violent predator specifications, in violation of R.C.2907.02(A)(2) and (B), felonies of the first degree; one count of kidnapping with a firearm and sexually violent predator specification, in violation of R.C. 2905.01(A)(3) and (4), a felony of the first degree; one count of attempted murder with a firearm and sexually violent predator specification, in violation of R.C. 2923.02(A) and (E), a felony of the first degree; and one count of felonious assault with a firearm and sexually violent predator specification, in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree. Appellant entered a plea of not guilty to the charges. On January 17, 2003, he waived his right to a jury trial. A bench trial commenced on January 21, 2003, and continued until January 24, 2003.
 {¶ 3} The following facts were revealed at the trial. On the evening of September 21, 2002, the thirty-two year old victim in this case, Katie, attended a wedding reception in Niles, Ohio. Thereafter, according to Katie, she stopped by a bar in Warren, Ohio, where she ran into her half brother, appellant. Katie stated that they were having a good time so she and appellant decided to go to a couple other bars. They picked up vodka, cigarettes, and a gun from their mother's house and stopped by appellant's home on Larchmont Avenue, where appellant got some things and put them in the trunk or back seat of his car. Katie believed that one of the items picked up at his home was another gun. The two proceeded to Jackson's Lounge in Warren, Ohio, where appellant wanted Katie to enter the establishment and rob it. Instead, appellant entered the bar with a gun, and once he returned to the car, he told Katie that he wanted to rob his in-laws, who were away camping and lived in Leavittsburg, Ohio.
 {¶ 4} Appellant and Katie arrived at appellant's in-laws' home, and appellant exited the car and disappeared for a bit. When he returned to the automobile, Katie noticed that he looked like he was "pissed off at the whole world * * * [and] like something had like snapped or something." All of a sudden, appellant hit Katie in the head with his hand and his ring left a wound on her face. He then dragged her out of the car by her hair into a wooded area behind his in-laws' house. He ordered her to the ground and told her to remove her clothes. She complied because he had one gun in his hand and another one in his pants. With a gun pointed at her head, he told her to stick her tongue out "so he can suck on it * * *." At some point, Katie recalled that appellant hit her in the head and back with a stick and that he "head butted" her in the nose. Appellant then engaged in vaginal intercourse with Katie. Katie got up and ran, but appellant caught and tackled her causing her to re-injure her ankle. Appellant took her back to his car where she got dressed.
 {¶ 5} Katie testified that appellant repeatedly stated that "[h]e's not going to prison for [her] * * *." With a gun pointed at Katie's head, appellant drove his car back to his home, and dragged her by her hair into the basement. By this time, Katie noticed that the sun was starting to rise. Once in the basement, appellant ordered Katie to get undressed, bound her hands with wire, forced her legs apart by securing them with wire, gagged her mouth, put a hood over her head and taped it to her face, and dangled her from a ceiling mounted hook.
 {¶ 6} After Katie was secure, appellant started groping and touching her vagina and breasts with his hands at first. He attempted to have sex with her, but he could not "get aroused enough to get [his penis all the way] inside of [her]." Appellant then applied a cold, wet lubricant on Katie's vagina with his fingers. Next, appellant shoved some object inside of Katie, which she was unable to identify since her eyes were covered. She stated that it caused her pain and produced lacerations. She was bawling, but she could not say anything as she was gagged. Appellant proceeded to position himself behind Katie, and although she was unable to describe his specific actions, she recalled that "[t]here was something going on back there, but, I mean I couldn't tell you because there was so much pain at this point. I mean, my head, my nose, my ankle, I mean, my vagina, I mean."
 {¶ 7} During this time, appellant left Katie unattended a couple of times to answer his telephone upstairs. Katie was able to lift the gag a little bit and free her hands from the hook long enough to dial 9-1-1 on appellant's cellular phone, which he had left in the basement. She told the dispatcher she was scared and left the phone on after appellant returned to the basement. She set the phone on the shelf thinking that "maybe somebody would hear something or catch on or comprehend that something was going on * * *." The audiotape of the 9-1-1 call was played at the trial, and Katie was heard saying, "Dennis, stop. You're hurting me."
 {¶ 8} Next, appellant untied Katie's feet and removed her hood and gag. He ordered Katie to place her head in a bucket, and stated it was time for him to shoot her because he was not going to prison for her. Katie refused and told appellant to go ahead and shoot her. Appellant smacked Katie with a board. Katie felt appellant was very close to shooting her, but their cousin, Scott Jacobsen ("Jacobsen"), came into appellant's home and, as a result, appellant went upstairs. Jacobsen related that he went to appellant's house at the request of appellant's wife. According to Jacobsen, appellant's wife was worried about him, so she gave Jacobsen her keys to the house.
 {¶ 9} While appellant was upstairs with Jacobsen, Katie unhooked herself, untied her legs, and ran up the stairs naked. According to Katie, Jacobsen began "freaking out[.]" Katie further stated that appellant told Jacobsen that he was not letting her go because he was not going to prison for her. Eventually, Jacobsen told Katie to go to his vehicle and he drove her to her mother's house. Jacobsen recalled telling Katie's other brother, Michael Stambolia ("Michael"), what had transpired. Michael told Katie's mother, and her mother called the police and took her to the hospital.
 {¶ 10} Jacobsen testified that when he saw Katie run upstairs naked, he was not surprised because that was the kind of girl she was. However, he did hear appellant tell her to get back downstairs. Jacobsen stated that when Katie first ran up the stairs, she was not crying and that she only started crying after she saw him. Jacobsen recalled that Katie had a "plastic bag with some tape around her neck and she had a handkerchief around the bottom of her chin * * *." He referred to the handkerchief as a gag. Jacobsen also indicated that appellant had a firearm that he gave to Jacobsen. However, when Jacobsen left appellant's home, he gave it back to him. According to Jacobsen, there were some red marks around Katie's wrists.
 {¶ 11} The state's case also consisted of testimony and pictorial evidence from various medical personnel and police officers that corroborated Katie's claim. The emergency room physician documented contusions and abrasions to Katie's right shoulder, forearms, abdomen, right leg, and thigh, and swelling on the left foot and ankle. The physician also observed two vaginal lacerations. He collected evidence for a rape kit to submit to the Bureau of Criminal Investigation ("BCI"). The triage nurse stated that Katie told her she had been sexually assaulted by her brother. The triage nurse also noted that Katie's hair had pieces of debris, like dried leaves, in it. A registered nurse testified that Katie had some bald spots on her head which was consistent with Katie's statements that her hair had been pulled. She also saw circular abrasions to Katie's wrists, which was consistent with the red marks that Jacobsen observed.
 {¶ 12} The Howland Police Department investigated the matter. Patrolman Jeffrey R. Urso ("Officer Urso") met Katie at the hospital and photographed her injuries. He testified that she had visible injuries to the top of her head and bruising to her arms, back, and legs. Officer Urso and other officers who spoke with her noticed that she was very upset and emotional.
 {¶ 13} The police searched appellant's home after receiving consent from his wife. In the basement, officers discovered a metal hook from the ceiling joist, packaging tape with human hair sticking to it, tape and wire that was balled together with human hair stuck inside, a vinyl cover with hair stuck inside the tape and blood stains, antenna wire and other pieces of loose wire on the basement floor, shoelaces, a pair of panties, a half inch piece of plywood with screws in it, a snow cone maker, a rubber dildo, and some petroleum jelly.
 {¶ 14} In an interview with Detective Sergeant Paul Monroe ("Detective Monroe") of the Howland Township Police Department, appellant denied being out with his sister, arguing with her, having sex with her, and beating her. In fact, when appellant was confronted as to why Jacobsen had seen Katie at his house naked, he denied that Katie was even at his house.
 {¶ 15} Brenda Gerardi, a BCI forensic scientist, took the stand and related that she performed a DNA analysis on the rape kit, appellant's saliva samples, and on the various items extracted from appellant's home. She discovered semen on a rectal swab that matched appellant's sample.
 {¶ 16} At the conclusion of the state's case, appellant moved for a Crim.R. 29 motion for acquittal on all counts. The trial court denied the motion with respect to all the counts except for the one count of attempted murder. The court explained that the state had not proved a case for attempted murder, and therefore, the charge of attempted murder was dismissed.
 {¶ 17} For appellant's case-in-chief, appellant's and Katie's mother, Bonnie Stambolia ("Bonnie") took the stand and related that she had been with Katie at the wedding reception on the night in question. Bonnie revealed that Katie was intoxicated at the wedding reception. Appellant's sister-in-law testified that she was with Katie at the bar that night. She recalled seeing appellant enter the bar. She stated that appellant was there to pick Katie up because she was drunk and "vulgarly dancing upon a gentleman who was sitting in a chair * * *." Bonnie and her sister both stated that Katie had a propensity to lie and that she abused drugs and alcohol.
 {¶ 18} At the close of appellant's case, he renewed his Crim.R. 29 motion with respect to all the counts except the attempted murder count. The trial court denied the motion. On January 24, 2003, the trial court found appellant guilty of: (1) five counts of rape with the firearm specifications; (2) one count of kidnapping with a firearm and a sexual motivation specification; and (3) one count of felonious assault with a firearm and a sexual motivation specification.[1]
 {¶ 19} A sentencing hearing was held on February 26, 2003. In an entry dated March 4, 2003, appellant was sentenced as follows: a term of nine years on count one, rape, and three years on the firearm specification to be served consecutive to the nine year term; a term of nine years on count two, rape, to be served consecutively with the sentence imposed in count one, and three years on the firearm specification, which is to merge with the firearm specification in count one; a term of nine years on counts three, four, and five, rape, to be served concurrently with each other and concurrently with the sentences imposed in counts one and two, and the firearm specifications for counts three, four, and five are to merge with the firearm specifications in counts one and two; a term of seven years on count six, kidnapping, to be served consecutively with the sentences imposed in counts one through five and the firearm specification to merge with the other firearm specifications; and a term of four years for count eight, felonious assault, to be served consecutively with the other sentences imposed and the firearm specification to merge with the other firearm specifications. Therefore, appellant was sentenced to an aggregate term of thirty two years incarceration. Appellant timely filed the instant appeal and now assigns the following as error:
 {¶ 20} "[1.] The trial court erred in considering inappropriate information while sentencing appellant.
 {¶ 21} "[2.] The trial court erred by imposing sentences greater than the minimum sentence available upon appellant, in violation of R.C. 2929.14(B).
 {¶ 22} "[3.] The trial court erred by sentencing appellant to serve consecutive, rather than concurrent sentences.
 {¶ 23} "[4.] [Appellant's] convictions are against the manifest weight of the evidence."
 {¶ 24} Preliminarily, we note that in response to appellant's supplemental briefing that Blakely v. Washington (2004),124 S.Ct. 2531, has no application to the underlying facts and law pertaining to this matter.
 {¶ 25} Under the first assignment of error, appellant argues that the trial court abused its discretion when in considered information during his sentencing hearing that was based on a crime that was neither charged nor proven.
 {¶ 26} Appellant's first assignment of error challenges the sentencing proceedings on the basis that the judge considered improper evidence. The rules of evidence do not apply to sentencing hearings, and the judge may consider any reliable evidence in the record. Evid.R. 101(C); State v. Cook (1998),83 Ohio St.3d 404, 425. Ohio's appellate courts have held that a trial court may not consider a crime neither charged nor proven when it is sentencing an offender. State v. Gipson (May 20, 1999), 8th Dist. No. 75369, 1999 WL 328610, at 6; State v.Goodman (Jan 26, 1998), 5th Dist. No. 1997CA00171, 1998 WL 516300, at 3; State v. Longo (1982), 4 Ohio App.3d 136, 141.
 {¶ 27} In the instant matter, during the sentencing hearing, the prosecutor indicated that anyone who would kidnap, torture and rape his own sister at gunpoint and then "[s]olicit people while in jail to have that very same sister killed so she will not be able to testify should his appeal be successful, that person is clearly a threat to the safety of the public * * *." Appellant's attorney did not object, but instead responded by stating that it was "* * * outrageous and unthinkable [for that statement] to just be brought up this morning at a sentencing hearing for the first time and that's crazy." The trial judge noted, as one of the factors it considered, that appellant "plotted with another inmate to kill his sister, the victim in this case * * *." This "plot" did not result in charges or a conviction. The judge further explained that appellant "was planning to pull a robbery at gunpoint on the night in question, and while he was not charged for this, it is indicative of [his] proclivity for violence * * *."
 {¶ 28} Appellant claims that the mere mention of uncharged arrests and charges without a conviction was error on the trial court's part. Furthermore, although the judge discussed the alleged plot to kill the victim, that was not the only factor he measured in sentencing appellant. He considered fifteen other factors in imposing sentence. While the court concluded that appellant had a proclivity toward violence, it did not use the uncharged offenses as the sole basis for its sentence. At the sentencing hearing, the court referred to several other factors which will be discussed in the second and third assignments of error. Therefore, any error that occurred was harmless under the circumstances in view of the other overwhelming factors considered by the court in support of its sentencing. Appellant's first assignment of error lacks merit.
 {¶ 29} For the second assignment of error, appellant contends that the trial court committed error by sentencing him to serve a term of prison greater than the minimum even though the record revealed the court did not find any factors pursuant to R.C.2929.14(B) and because he had not previously been incarcerated.
 {¶ 30} Our review of a felony sentence is de novo. R.C.2953.08. We will not disturb an appellant's sentence unless it finds, by clear and convincing evidence, that the record does not support the sentence or that the sentence is otherwise contrary to law. State v. Thomas (July 16, 1999), 11th Dist. No. 98-L-074, 1999 WL 535272, at 4.
 {¶ 31} Sentencing law carries a presumption that a defendant who has not previously served a prison term should receive the minimum term. See R.C. 2929.14(B). However, the trial court may impose a sentence exceeding the minimum if it specifies on the record "that the shortest prison term will demean the seriousness of the conduct or will not adequately protect the public from future crime by the offender." State v. Edmonson (1999),86 Ohio St.3d 324, 325; State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, at ¶ 26. Hence, R.C. 2929.14(B) requires a sentencing court to impose the minimum sentence for first-time imprisonment unless it specifies on the record that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence. Edmonson,86 Ohio St.3d at 326. In other words, a trial court "must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons." Id.; Comer,2003-Ohio-4165, at ¶ 26 (holding that pursuant to R.C.2929.14(B), a trial court is "required to make its statutorily sanctioned findings on the record at the sentencing hearing" when imposing a nonminimum sentence).
 {¶ 32} "R.C. 2929.14(B) does not require that the trial court give its reasons for its finding that the seriousness of the offender's conduct will be demeaned or that the public will not be adequately protected from future crimes before it can lawfully impose more than the minimum authorized sentence." (Emphasis sic.) Edmonson, 86 Ohio St.3d at syllabus. A sentence that merely repeats the language contained in R.C. 2929.14(B), without any consideration of the factors set forth in R.C. 2929.12(B), would be insufficient. State v. Hunt (July 7, 2000), 11th Dist. No. 99-A-0033, 2000 WL 915104, at 2.
 {¶ 33} Here, it is undisputed that appellant has never previously served a prison term. Thus, appellant argues that the presumption in favor of minimum sentences contained in R.C.2929.14(B) applies to him. He argues that without the requisite findings to overcome the presumption for minimum sentences, the trial court's nonminimum sentences must be reversed. Hence, we must look to the transcript of the sentencing hearing to determine whether the trial court stated the findings required before imposing non-minimum sentences on appellant. A thorough review of the transcript reveals that the trial court specifically stated that:
 {¶ 34} "THE COURT: Okay. Now the Court will incorporate the presentence investigation into this sentencing hearing and I will make the following findings: No. 1, [appellant's] relationship with the victim did facilitate the offense; No. 2, the victim suffered serious physical and psychological harm; No. 3, the offenses were committed with and facilitated by the use of firearms; No. 4, [appellant] shows no genuine remorse; No. 5, the offenses that were committed by [appellant] were sexually motivated and many of the offenses were, in fact, sexual offenses; No. 6, [appellant] attempted to cause and did cause physical harm with a weapon; No. 7, [appellant] has plotted with another inmate to kill his sister, the victim in this case; No. 8, [appellant] has committed the worst form of the offenses for which he was convicted; No. 9, [appellant] poses a great likelihood of committing future crimes against his sister; No. 10, [appellant's] conduct was exacerbated in this case by the combined use of drugs and alcohol and [appellant] does not acknowledge any drug or alcohol problem; No. 11, the evidence indicates [appellant] was planning to pull a robbery at gunpoint on the night in question, and while he's not charged for this, it is indicative of [his] proclivity for violence; No. 12, consecutive sentences are necessary to protect the public and adequately punish [appellant]; No. 13, consecutive terms are not disproportionate to [appellant's] conduct and to the public danger posed by [him]; No. 14, the harm in this case is so great and unusual that a single term does not adequately reflect the seriousness of the conduct; No. 15, the shortest term demeans the seriousness of the offenses and does not adequately protect the public; No. 16, after reviewing the conduct of [appellant] the Court finds that none of the crimes for which [he] was convicted were allied offenses of similar import. Specifically with regard to the count of kidnapping, * * * the Court finds that the restraint was prolonged and the movement was substantial so as to support a separate animus and also subjected the victim to a substantial risk of harm that was separate and apart from the rapes. * * *."
 {¶ 35} Based on the foregoing colloquy, it is our view that the trial court mentioned both of the findings enumerated in R.C.2929.14(B). Further, it is evident that the trial court considered the R.C. 2929.12(B) factors. Hence, we conclude there was an adequate discussion on the record of the factors in compliance with Comer and that the trial court properly followed R.C. 2929.14(B) and the holdings of this court in sentencing appellant to a term longer than the minimum. Appellant's second assignment of error is meritless.
 {¶ 36} In the third assignment of error, appellant alleges that the trial court erred when it sentenced him to serve consecutive sentences where there was no clear and convincing evidence to support its findings under R.C. 2929.19(B)(2)(c).
 {¶ 37} When imposing consecutive sentences, the trial court must first determine that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C. 2929.14(E)(4). Next, the trial court must find that one of the following factors listed in R.C. 2929.14(E)(4) is also present: (a) that the offender was awaiting trial or sentencing or was under community control sanctions; (b) that the harm caused by the offenses was so great that a single prison term would not adequately reflect the severity of the conduct; or (c) that the offender's prior criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. State v.Norwood (June 8, 2001), 11th Dist. No. 2000-L-072, 2001 WL 635951, at 4.
 {¶ 38} The court must also follow the requirements set forth in R.C. 2929.19(B) when sentencing an offender to consecutive sentences under R.C. 2929.14. Specifically, R.C. 2929.19(B)(2)(c) requires that the trial court justify its imposition of consecutive sentences by making findings that gives the court's reasons for selecting that particular sentence. The Ohio Supreme Court held that when ordering a defendant to serve consecutive sentences, the trial court must make its statutorily required findings at the sentencing hearing. Comer, 99 Ohio St.3d at paragraph one of the syllabus.
 {¶ 39} In the case sub judice, the trial court made findings under R.C. 2929.14(E)(4). As mentioned in the second assignment of error, the trial court stated that it believed consecutive sentences were appropriate and specifically stated that "consecutive sentences [were] necessary to protect the public and adequately punish [appellant] * * * [and that] consecutive terms are not disproportionate to [appellant's] conduct and to the public danger posed by [him] * * *." In support of its findings, the trial court cited to the harm caused by appellant and his relationship with the victim, the likelihood of recidivism, the nature of the assault, and his lack of genuine remorse. It is our position that the facts of this case sufficiently support the above findings. See State v. Gonzalez, 154 Ohio App.3d 9,2003-Ohio-4421, at ¶ 135-136. Accordingly, appellant's third assignment of error has no merit.
 {¶ 40} In the fourth and final assignment of error, appellant posits that his convictions are against the manifest weight of the evidence.
 {¶ 41} When reviewing a claim that the judgment was against the manifest weight of the evidence, a reviewing court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387; State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 WL 738452, at 5.
 {¶ 42} Unlike a sufficiency of the evidence challenge, a manifest weight of the evidence claim contests the believability of the evidence presented. Schlee at 6. Thus, "[t]he issue when reviewing a manifest weight of the evidence challenge is whether `there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.'" State v. Wright (Mar. 29, 2002), 11th Dist. No. 2000-P-0128, 2002 WL 480328, at 4. See, also, State v.Nields (2001), 93 Ohio St.3d 6, 25.
 {¶ 43} In order for an appellate court to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Thompkins at 387.
 {¶ 44} In the case at hand, appellant was convicted of five counts of rape, kidnapping and felonious assault. The evidence at trial revealed that Katie was dragged by her hair to a wooded area behind appellant's in-laws' home and raped. The testimony of Katie and Jacobsen also revealed that appellant was carrying two guns. She was then taken in appellant's car at gunpoint to his home where she was gagged and tied in order to be raped again and again. Furthermore, even though there was testimony that Katie was a liar and had a tendency to sleep around, the medical, pictorial and scientific evidence supported Katie's assertions.
 {¶ 45} Based on our review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, it is our view that the trial court clearly did not lose its way and create such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. Appellant's fourth assignment of error is without merit.
 {¶ 46} For the foregoing reasons, appellant's assignments of error are not welltaken. The judgment of the Trumbull County Court of Common Pleas is affirmed.
Christley, J., Rice, J., concur.
[1] A hearing was held on January 27, 2003, regarding the sexually violent predator specifications contained in the indictment, and appellant was found not guilty as to all counts.